COLUMBIAN MUT. LIFE INS. Co. *v.* MARTIN *et al.*

(*Nashville,* December Term, 1939.)

Opinion filed February 3, 1940.

518

Scott Fitzhugh, Charles S. Seay and H. M. Crymes, all of Memphis, for complainant.

Grover McCormick, of Memphis, for defendant.

Mr. Chief Justice Green delivered the opinion of the Court.

This suit was brought to compel the delivery up and cancellation of a policy issued by complainant Insurance Company on the life of James George, deceased. An answer and cross-bill was filed by the administratrix of

520

George and proof taken. The chancellor dismissed the bill and rendered a decree on the policy for the amount thereof in favor of the administratrix. The Court of Appeals affirmed this decree and this court granted complainant's petition for *certiorari.*

The trial below was had before the chancellor and a jury but the case was withdrawn from the jury and decided by the chancellor. Since the determinative facts are not in dispute, we think there was no error in this.

Much of the proof offered by complainant was excluded but has been preserved in the bill of exceptions. Inasmuch as the chancellor decided the case himself and we can do likewise without remand, it is not important that we should consider in detail the propriety of the rulings on evidence made below. In general, we think all the evidence offered was competent which tended to show fraud of the insured and of one Martin, hereafter mentioned, in the making of this contract. *New York Mutual Life Ins. Co.* v. *Armstrong,* 117 U. S., 591, 6 S. Ct., 877, 29 L. Ed., 997.

James George was an ignorant young man about twenty-two years of age at the time this policy on his life was written, to-wit, May 8, 1935. He was employed on a small salary at a filling station operated by one James O. Martin, in the City of Memphis. At the instance of Martin, George signed an application for the policy of insurance here in suit. The policy was delivered at the filling station and placed in Martin's desk there where it remained. The policy was payable to George's estate in the sum of $1,000 and contained a provision for double indemnity in case of accidental death. Martin paid the first premium and all subsequent premiums. No assignment of this policy was ever made. It

remained as written, payable to George's estate, up to the time of his death.

On February 17, 1938, George met his death. He was killed by two negroes, hired by Martin to commit the murder. Martin and the two negroes have since been tried, convicted, and executed for the crime.

At the time of George's death four policies of insurance on his life were in force. The policy here in suit, one in the Protective Insurance Company of Birmingham for $3,500, one in the New York Life Insurance Company for $2,500, and one in the National Life and Accident Insurance Company for $5,000. As we understand the record, the policy issued by the Protective Life Insurance Company of Birmingham was payable to George's estate, the policy issued by the New York Life Insurance Company was payable to Martin, and the policy issued by the National Life and Accident Insurance Company was payable to George but was assigned to Martin.

While Martin had no insurable interest in the life of George, the proof shows that in addition to the four policies of insurance mentioned Martin had tried to obtain insurance on George's life in several other companies, but had failed. There is evidence also that Martin had attempted to procure insurance on the life of another young man formerly in his employ. Generally, Martin would endeavor to get these insurance policies on George's life and on the life of the other young man written payable to himself (Martin). In most cases the insurance companies refused to write such policies, Martin being without insurable interest in George's life. Martin paid all the premiums on all four policies existing at the time of George's death and all of them were kept in the desk at Martin's filling station.

522

There is no doubt upon this record that Martin procured these policies or induced George to procure them with the intention on Martin's part of having George murdered and getting the proceeds of the policies for himself. Such being the facts, the theory of complainant's bill herein is that the policy it seeks to have canceled was void from its inception by reason of fraud practiced on complainant; that it was void as a wager policy; and that public policy denies any recovery thereon.

We doubt that the policy here in suit could be described as a wager policy. As stated before, it was payable to the estate of the insured and was never assigned.

█ We are not sure that public policy would intervene to prevent recovery on the contract except as hereafter indicated. In general there is no public policy which prevents recovery on a contract of insurance when the insured is murdered, unless benefits of the contract go to the murderer. *Cleaver et al.* v. *Mutual Reserve Fund Life Association* [1892], 1 Q. B., 147; *Sharpless* v. *Ancient Order of United Workmen,* 135 Minn., 35, 159 N. W., 1086, L. R. A., 1917B, 670, and cases collected in Notes, 3 L. R. A., N. S., 726, and L. R. A., 1917B, 671.

█ However, we think the contract of insurance before us should be avoided for fraud. We do not find that George was guilty of any fraud in the transaction. It is argued that George acquiesced in Martin's plan for taking out this insurance for Martin's ultimate benefit with the intention of assigning the policy to Martin, knowing the latter had no insurable interest in his (George's) life, and that thereby George committed fraud on the insurance company.

If George did have such intent when the policy was taken out, this intention was abandoned and the policy

remained payable to George's estate. In other words, George committed no overt act toward effecting any such fraud and without such an act on his part, the complainant would be entitled to no relief on account of his intent. 23 Am. Jur., 744.

Martin, of course, was guilty of fraud in bringing about the execution of this contract between George and the complainant, with the intent, subsequently carried out, of murdering George and getting the benefit of the policy.

The general rule is that a party to a contract cannot be relieved on account of the fraud of a third person in procuring the execution of such contract, that third person not being an agent of nor acting in collusion with the opposite party. *Cason* v. *Cason,* 116 Tenn., 173, 93 S. W., 89, reviewing many decisions. But we think all these cases apply this rule where the party profited by the fraud has parted with value or has materially changed his position in reliance on the transaction.

In the case before us, George never paid any of these premiums. All of them were paid by Martin. George was out not one cent. He was a donee of the policy and its benefits. It would be unconscionable to permit his estate, George being out nothing, to obtain benefits from this felonious fraud practiced by Martin on complainant Insurance Company.

"A person, though innocent, cannot avail himself of any advantage obtained by the fraud of another, unless there is some consideration moving from himself." *Huguenin* v. *Baseley,* 14 Ves., 273.

In a later English case the Vice Chancellor said: "This case is brought within the broad principle, that no one can avail himself of fraud. As it was held in *Huguenin* v. *Baseley,* 14 Ves., 273, and the other cases

cited in argument, where once a fraud has been committed, not only is the person who has committed the fraud precluded from deriving any benefit from it, but every other person is so likewise, unless there has been some consideration moving from himself. Where there has been consideration moving from a third person, and he was ignorant of the fraud, there such third person stands in the ordinary condition of a purchaser without notice; but where there has been no consideration moving from himself, a third person, however, innocent, can derive no sort of benefit or advantage from the transaction." *Scholfield* v. *Templer,* Johns., 156.

This rule of the English cases is referred to in Williston on Contracts (Revised Edition), Vol. 5, section 1518(2), where a number of American decisions are cited as in accord.

In Restatement of the Law of Contracts, section 477, the Comment is as follows:

"As between the original parties to a transaction induced by the fraud or material misrepresentation of a third person, the injured party has power of avoidance unless the other party is not only ignorant of the fraud or misrepresentation when he enters into the transaction, but has either parted with value or has changed his position materially in reliance on the transaction. A donee cannot conscientiously retain an advantage obtained from another because of a third person's misconduct, even if the donee neither knew nor had reason to know of it."

The foregoing authorities which clearly embody a sound rule seem decisive against any claim of George's estate to benefits under this insurance policy. Martin doubtless expected to get the benefit of the policy himself by a subsequent assignment, a claim of equitable assign-

ment, a will, or otherwise. The effect of Martin's fraud, however, does not depend on any interest he had or might acquire in this policy of insurance.

█ It is urged that the incontestable provision of the policy prevents consideration of the defenses interposed, that provision following section 6179(3) of the Code. This is that all life insurance policies shall contain "A provision that the policy shall constitute the entire contract between the parties, and shall be incontestable after two years from its date, except for nonpayment of premiums and except for violations of the conditions of the policy relating to naval and military services in time of war." This policy was nearly three years old at the time George was killed.

We think this contention must be denied under authority of *Clement* v. *Insurance Co.,* 101 Tenn., 22, 46 S. W., 561, 564, 42 L. R. A., 247, 70 Am. St. Rep., 650. In that case an incontestable provision of the policy was held not available to an assignee who was denied recovery upon the policy because without insurable interest in the life of insured. The procurement and transfer of the policy were parts of a fraudulent scheme to evade the law forbidding wagering policies. The court said that the stipulation as to incontestibility "relates only to matters arising between the insurer and the insured, and not to matters in which third persons are concerned." It was further said that the provision "relates to the issuance of the policy and the representations made to obtain it."

In *Clement* v. *Insurance Co., supra,* this court undertook to explain such stipulations in life insurance policies in these words:

" 'The practical and intended effect of the stipulation is to create a short statute of limitation in favor of the

insured, within which limited period the insurer must, if ever, test the validity of the policy.' . . .

"It has been well said: 'The effect of the provision is to prevent the insurer from interposing as a defense the falsity of the representations of the insured, which is a fraud. But it does not prevent abandonment, rescission, and cancellation of the contract for such fraud provided the action for that purpose is brought within a year.' It is virtually saying to the insured that 'I will take one year in which to ascertain whether your representations are false or not, and whether you have been guilty of any fraud in obtaining the contract; and if, within that period, I cannot or do not detect such falsity and fraud, I will obligate myself to make no further inquiry in the matters, and to make no defense on account of them.' "

The foregoing has been repeated and elaborated in *Humpston* v. *State Mutual Life Assurance Co.*, 148 Tenn., 439, 256 S. W., 438, 31 A. L. R., 78.

A statute of limitations runs from accrual of the right of action. Martin's fraud against the insurer here was not consummated until he had George murdered more than two years from the date of the policy. After two years and prior to the murder the insurer had no basis upon which to seek rescission or seek cancellation of the contract. No defense to liability on the contract. There was nothing unlawful in Martin's paying the premiums on this policy on George's life payable to George's estate. *Bendet* v. *Ellis*, 120 Tenn., 277, 111 S. W., 795, 18 L. R. A., N. S., 114, 127 Am. St. Rep., 1000; *Quinn* v. *Catholic Knights*, 99 Tenn., 80, 41 S. W., 343; *Warnock* v. *Davis*, 104 U. S., 775, 781, 26 L. Ed., 924.

It was not intended by the incontestability stipulation

to cut off a right of action or a defense which did not arise until more than two years after the date of the contract. The Legislature had no thought of requiring that a stipulation of such meaning be included in life insurance policies. A Statute of Limitations cannot run against a nonexistent right.

Contrary to the weight of authority, this court held in *Insurance Co.* v. *Fox,* 106 Tenn., 347, 61 S. W., 62, 82 Am. St. Rep., 885, that a policy of life insurance may validly include a provision that it shall be incontestable from the date of its issuance for fraud or other causes. This, because the insurer is under no obligation to write the policy in any definite time after application, or to write the policy at all. The insurer may take as long as it desires for investigation before entering into the contract. This court has not sanctioned any contract of insurance whereby the parties undertook to waive all fraud committed by one of them in the future. So we reiterate the language of *Clement* v. *Insurance Company* and again hold that the incontestable stipulation in the policy before us "relates to the issuance of the policy and the representations made to obtain it."

There was nothing decided in *Stillman* v. *Insurance Co.,* 131 Tenn., 303, 174 S. W., 1131, L. R. A., 1915F, 707, and *Jackson* v. *Loyal Additional Ben. Ass'n,* 140 Tenn., 495, 205 S. W., 318—the suicide cases—contrary to the views above indicated. Those cases considered the question of permitting recovery on a policy of life insurance when the insured committed suicide—the policies not excluding recovery under such circumstanes and the policies not being taken with a suicidal intent on the part of the insured. The statutory incontestable provision was not involved in either case, although in the opinion in the later case I erroneously stated that this

provision was involved in the former case. This was an inadvertence overlooked by the court because of no consequence in the decision. The particular provision considered in *Silliman* v. *Insurance Company,* [131 Tenn., 303, 174 S. W., 1132, L. R. A., 1915F, 707], was one running "in case of suicide, committed while sane or insane within one year from the date on which this insurance begins, the limit of the recovery hereunder shall be the premiums paid." The difference between the quoted clause and the statutory incontestable clause is obvious.

The judgment below must be reversed.

NOTE. We are not unmindful of the rule of construction that exceptions strengthen the force of a general provision and ordinarily exclude exceptions other than those named. However, "it would be absurd, as well as useless, to except from a granted power, that which was not granted—that which the words of the grant could not comprehend." *Gibbons* v. *Ogden,* 9 Wheat., 1, 191, 6 L. Ed., 23. The incontestable stipulation being "a statute of limitations" and by its terms running from the date of the policy, could not run against nonpayment of premiums and military service, defaults occurring subsequent to that date. These things were not comprehended by the stipulation in the first instance and their exception was useless. Such exceptions, therefore, were mere surplusage and may be ignored.